Estate of Pierre Jay Wurts, Deceased, Edith M. B. Wurts and Fiduciary Trust Company of New York, Executors v. Commissioner.
Estate of Wurts v. Commissioner
Docket No. 71864.
United States Tax Court
T.C. Memo 1960-102; 1960 Tax Ct. Memo LEXIS 187; 19 T.C.M. (CCH) 544; T.C.M. (RIA) 60102; May 25, 1960
Lewis D. Mowry, Jr., Esq., 55 North Dean Street, Englewood, N.J., for the petitioner. William F. Fallon, Esq., for the respondent. TIETJENS
Memorandum Opinion TIETJENS, Judge: The respondent determined a deficiency in estate tax in the amount of $13,665.36. The issue for decision is whether the value of a trust created by the decedent in 1938 is includible in the gross estate. The facts are found *188 as stipulated and the stipulation is incorporated by this reference. The estate tax return was filed with the director of internal revenue at Newark, New Jersey. The petitioner is the Estate of Pierre Jay Wurts, Deceased. The duly appointed executor and executrix are Fiduciary Trust Company of New York and Edith M. B. Wurts. The decedent died on October 28, 1953, testate, a resident of Englewood, New Jersey. Surviving him were Edith M. B. Wurts, his widow, and Miriam Jay Andrus, his daughter. The decedent, on December 30, 1936, created a trust naming Fiduciary Trust Company as trustee. He retained the right to revoke or amend the agreement. The net income was to be paid to him for life and to Edith M. B. Wurts thereafter, with principal payable to Miriam Jay Andrus upon termination. The corpus of the trust was originally 5,000 shares of stock in Noranda Mines, Ltd. On October 28, 1953, the corpus consisted of 4,000 shares of such stock. Noranda Mines, Ltd. is a Canadian corporation and its character and dividend record and price range, as shown in Standard Corporate Descriptions (February-March 1959) and the composite price index on page 30 of Trade and Securities Statistics, *189 Security Price Index Record (1957 Edition), both published by Standard and Poor's Corporation, New York, are as follows: "The company was organized in Canada in 1922. It is among the more important producers of copper and gold in Canada. Directly and through subsidiaries and affiliates it engages in nearly all phases of the copper industry from mining, smelting and refining to fabrication of such products as wire, cable and pipe. Its ores also contain silver and pyrite, a mineral iron from which sulphur and iron oxide are obtained. Production of sulphuric acid began in mid-1956 and has since been expanded. "Its stock is listed on the Toronto Stock Exchange." Dividends in Canadian funds have been paid from 1930 to 1953 as follows: 1930
$2.50 (Initial)
1931
.50
1932
1.10
1933-5
2.00
1936
3.00
1937
3.25
1938-46
4.00
1947
$2.00
1948
3.25
1949-53
4.00
Over the 1938-1953 period the price range of the stock has been as follows: Low
High
1938-42
$36.00
$84.00
1943
40.00
52.00
1944
48.00
60.00
1945
50.00
63.00
1946
45.00
72.00
1947
42.00
54.00
1948
43.00
58.00
1949
48.00
69.00
1950
63.00
74.00
1951
69.00
86.00
1952
73.00
85.00
1953
58.00
78.00
*190 On December 28, 1938, Pierre, as grantor, and Fiduciary, as trustee, executed a trust agreement. The corpus was 1,000 shares of stock in Noranda Mines, Ltd. The entire net income was to be paid to Edith for life and thereafter to Miriam for life. The agreement provided, in part: "During the lifetime of the Grantor, provided he shall not have by a written instrument received by the Trustee directed otherwise or the Trustee shall not have received notice that the Grantor has been declared legally incompetent, the Trustee shall make no investment or pur chase for the trust fund nor make any reinvestment, sale or exchange of any assets which shall be part of the trust fund unless the Trustee shall be specifically directed to do so by the Grantor by a written instrument signed by him or his duly authorized agent, and received by the Trustee, nor shall the Trustee be obliged to make any suggestions or recommendations concerning any of the property belonging to the trust fund; it being agreed that the Trustee shall have no responsibility of any kind in connection with the investment or reinvestment of the trust property or of protecting the same other than the physical protection of the *191 evidences of ownership which may be delivered to it. "From and after the receipt of notice from the Grantor authorizing or directing the Trustee either to sell the property described in SCHEDULE 'A' or proceed in accordance with the investment provisions hereinafter in this Article set forth, or from and after the receipt of notice of the death of the Grantor or from and after the receipt of notice that he has been declared legally incompetent, whichever event shall first occur, the Trustee is hereby authorized in its absolute discretion: "(a) To make such purchases, sales or exchanges at such times, in such manner, and upon such terms as it shall determine; "(b) To invest in such bonds, preferred or common stocks, mortgages, interests in any kind of investment trust, or other evidences of rights, interests or obligations, secured or unsecured, or in such other property real or personal, as it shall determine, whether or not any investment shall produce income and without regard to any statute or other law concerning the investment of trust funds, or to the amount which shall be invested in any one security or in any one kind of investment; and "(c) To retain any investment *192 or to hold all or any part of the property held hereunder uninvested for such period of time as it shall determine. * * *
"The Trustee shall at any time or from time to time pay over and deliver from the principal of the trust fund such sum or sums as shall be requested in writing by Miriam Jay Andrus, provided however that not more than $30,000 from said principal shall be paid to her during the lifetime of Edith M. B. Wurts without the written approval of Edith M. B. Wurts. * * *
"It being the intention that the Trustee shall be free to make distributions of principal in advance of the times hereinabove specified if it shall deem such action advisable by reason of any emergency or by reason of any change of circumstances, the Trustee is therefore authorized, at such time or times and for such reason as it may deem proper and sufficient in its absolute discretion, to pay over the whole or any part of the principal, discharged of any trust, to the beneficiary entitled at the time of such payment to the current income of the property so paid over. * * *
"The Trustee is authorized in its absolute discretion: * * *
"To borrow money from itself or from any other *193 party, and to give or not to give security therefor, all upon such terms and for such periods as it shall deem advisable; "To lease (for any term whether or not in excess of one year or extending beyond the term of the trusts provided for herein), manage, mortgage, pledge, exchange, partition, grant options for the purchase of, contract for the sale of, sell or otherwise dispose of either at public auction or at private sale, any or all real or personal property held hereunder in such manner and upon such terms and conditions as it shall deem advisable; * * *
"To hold any or all of the property held hereunder in its name as Trustee, or in its name without designation of any fiduciary capacity, or in the name of a nominee, or unregistered and in such form as will pass by delivery; "To charge any and all expenses, costs, fees, taxes or other sums of money against the whole or any part or share of the property held hereunder, and against principal or income, as it shall determine; "Generally, with respect to any property held hereunder to exercise all such rights and powers, and to do all such acts, and to enter into all such agreements as persons owning similar property *194 in their own right might lawfully exercise, do or enter into. "The Trustee shall not be liable for any matter whatsoever so long as it acts in good faith but it will be liable for loss or damage caused by its actual fraud or wilful misconduct. No person dealing with the Trustee shall be bound to see to the application or disposition of cash or other property transferred to the Trustee or to inquire into the authority or propriety of any action by the Trustee. * * *
"All dividends payable in, and all rights to subscribe to, the stock of a corporation declaring such dividends or issuing such rights shall be deemed to be principal and not income. All ordinary cash dividends shall be deemed to be income and not principal, whether or not such dividends are either wholly or in part in the nature of a payment or partial liquidation or represent either wholly or in part a distribution of the assets of the company or corporation other than surplus earnings. The Trustee is authorized in its absolute discretion conclusively to decide and to fix the part of any extraordinary cash dividends or of any dividends payable in, or any rights to subscribe to, the stock of a corporation other *195 than the corporation declaring such dividends or issuing such rights, which shall constitute principal and the part which shall constitute income, and to determine whether or not any cash dividend is ordinary or extraordinary, except in so far as any law prohibiting the accumulation of income shall require that such dividends or rights shall be treated and disposed of as income. * * * "The Grantor if living, or if he be not living, the person or persons then entitled to the current income, may at any time, or from time to time, by an instrument in writing delivered to the Trustee remove the Trustee and appoint a successor trustee." A gift tax return covering the 1938 trust was duly filed and tax paid thereon. Fiduciary has at all times been trustee under the foregoing agreement. In April 1949 Pierre executed an amendment to the agreement renouncing any possible future interest in the property of the trust. On October 28, 1953, the fair market value of the property transferred in trust under the 1938 agreement was $59,007.84. Fiduciary was agent of separate investment management accounts for Pierre and Edith. The appraised value of such accounts as determined by Fiduciary *196 is shown in the following tabulation for each year from October 20, 1938 through October 15, 1953. Date
Pierre
Edith
October 20, 1938
$165,889
$ 86,992
October 21, 1939
169,103
84,276
October 21, 1940
159,322
78,326
October 21, 1941
149,581
74,050
October 21, 1942
144,764
68,310
October 19, 1943
162,189
79,882
October 19, 1944
165,169
83,217
October 22, 1945
188,024
96,660
October 22, 1946
178,377
98,132
October 21, 1947
177,869
111,644
October 21, 1948
175,347
111,694
October 20, 1949
178,328
123.770
October 19, 1950
193,581
147,053
October 18, 1951
222,809
199,233
October 16, 1952
221,562
194,384
October 15, 1953
224,928
211,883
Miriam Jay Andrus, pursuant to the provisions of the Trust Agreement of December 28, 1938, withdrew the following amounts from the corpus: Date
Withdrawal
November 15, 1939
$ 3,000
July 16, 1940
2,500
July 26, 1940
3,000
February 9, 1959
21,500
$30,000
The foregoing withdrawals constituted the full amount of principal to which Miriam was entitled under the Trust Agreement without the written approval of Edith. Edith owned real estate in Englewood, New Jersey, *197 known as 244 Cedar Street, which constituted the residence of Pierre and herself. This real estate had a value of at least $30,000 from and after 1938. The property was free and clear of any liens of any kind. Beginning in the year 1939 and through 1947, Edith filed separate income tax returns and her gross income, net income and income from the trust created on December 28, 1938, are tabulated below: Gross
Net
Income
Income
Income
from Trust
1939
$ 9,874.17
$ 5,251.76
$3,370.18
1940
9,939.15
6,127.76
3,176.78
1941
9,712.28
3,978.12
3,106.33
1942
9,404.18
6,302.25
3,117.63
1943
10,720.80
7,729.87
3,140.04
1944
10,892.91
9,318.16
3,148.27
1945
11,046.29
9,638.22
3,103.61
1946
12,269.35
12,978.91
3,182.12
1947
10,792.25
7,135.24
1,705.02
In the period 1940 through 1947, Pierre filed separate income tax returns and his gross income, his net income, and that portion of the income constituting income from the revocable trust created in 1936, is shown in the following tabulation for the respective years: Gross
Net
Income
Income
Income
from Trust
1940
$20,363.41
$15,100.97
$14,414.43
1941
21,322.84
13,299.35
14,414.40
1942
20,229.22
15,633.90
14,414.40
1943
20,590.67
16,798.38
14,414.40
1944
20,855.69
17,237.90
14,415.80
1945
20,531.91
17,594.61
14,462.21
1946
22,102.41
20,093.32
15,212.50
1947
15,262.44
11,548.11
7,960.00
*198 Commencing in the year 1948 and continuing through October 28, 1953, Pierre and Edith filed joint income tax returns. The gross income of both, included in such return, the net income, and the separate income of each from trusts are tabulated below: Income from Trusts
Gross Income
Net Income
Pierre
Edith
1948
$35,537.09
$27,401.82
$12,935.00
$2,706.72
1949
35,718.17
27,592.43
15,559.91
3,437.98
1950
37,954.87
29,349.11
15,074.05
3,057.97
1951
39,631.61
31,927.63
15,660.25
3,174.50
1952
39,517.30
24,556.22
16,381.25
3,364.37
1953
35,316.71
19,745.62
12,132.50
3,364.66
The executor and executrix filed an estate tax return on January 27, 1955. In such return no value was included by reason of the trust created December 28, 1938. The respondent contends that the corpus of the trust created in 1938 must be included in the gross estate because the decedent retained until the date of his death the power to designate who would enjoy the corpus or income or the right to change the enjoyment of the trust estate through a power to alter, amend or revoke the trust. Sections 811(c) and (d), Internal Revenue Code of 1939. *199 [1]
*200 The applicable provisions of law are based upon the principle that when a person is entitled to control the enjoyment or devolution of property and such control ceases at that person's death, there is a shift of economic benefits at that time and the estate tax applies. Porter v. Commissioner, 288 U.S. 436 (1933). The trust indenture provides, and the parties agree, that it is to be construed under the law of the State of New York. The petitioner concedes that under such law and under the indenture, the decedent had the power to remove the original trustee and appoint himself as successor trustee. The respondent contends, first, that the decedent, through the power to appoint himself trustee and the power to accelerate payments, retained until his death the right to shift the economic benefits of the trust as between his wife and daughter. Under section 811(d) there is to be included in the estate the value of any interest in property transferred in trust if the enjoyment thereof was subject at the date of death to any change through the exercise of a power to alter, amend, revoke or terminate. The respondent points to the provision authorizing the trustee to pay *201 over any part of the principal if it deems such action advisable "by reason of any emergency or by reason of any change in circumstances." While recognizing that authority to pay by reason of an "emergency" does not constitute a power to alter, amend or terminate, the respondent argues that "any change in circumstances" is so broad that the trustee's freedom to pay over principal under that provision is not limited by any external standard and that the decedent, as substituted trustee, could have paid over principal at will, whether or not the beneficiary was in need, hence this authority amounted to a power to alter, amend or revoke the trust. The respondent cites Estate of Albert E. Nettleton, 4 T.C. 987 (1945) in which we held a trust includible in the gross estate where the trustees, of whom the decedent was one, had power in their uncontrolled discretion to use and apply such part of the principal as they considered suitable and necessary in the interests and for the welfare of the beneficiary. The decedent in conjunction with the other trustees could under such power favor the life income beneficiary and diminish the share of the remainderman. We there concluded *202 that the power to disburse principal was, for all practical purposes, absolute. We do not consider the Nettleton case applicable here. The power of invasion of principal in the case before us is not without limit. In Jennings v. Smith, 161 F. 2d 74 (C.A. 2, 1947) the trustees, of whom the decedent was one, were authorized to invade principal if the beneficiary should "suffer prolonged illness or be overtaken by financial misfortune which the trustees deem extraordinary." No such contingency had occurred and the Court of Appeals held that the trustees were not free to exercise untrammeled discretion but were to be governed by external standards and that their power to invade capital, conditioned upon contingencies which had not happened, did not bring the trust property within section 811(d)(2). In Estate of C. Dudley Wilson, 13 T.C. 869 (1949) affd. 187 F. 2d 145 (C.A. 3, 1951) the decedent had created trusts for the benefit of his children and authorized a corporate trustee in its absolute discretion to accelerate payments of principal in case of need "for educational purposes or because of illness or for any other good reason." We held *203 that the power of the trustee to accelerate was not unrestricted, pointing out that any action by the trustee would be subject to regulation by a court to make sure that such action was within an honest discretion and not dependent upon a mere whim and that, if the decedent could have made himself trustee, he could not have distributed all the corpus to the beneficiaries unless some condition beyond his control justifying the distribution had arisen. The stipulated facts in the present case concerning the incomes of Pierre and Edith show that during the life of the decedent there was never any financial adversity of the life beneficiary which would require or justify an invasion of principal of this trust. While the respondent argues that these facts are irrelevant, we consider them pertinent in reference to the likelihood of financial need. The only purpose of the authorization to pay over principal by reason of a change in circumstances would be to protect Edith or Miriam in the event of an adverse change in financial circumstances. The power is not unlimited. The trustee, whether Fiduciary or Pierre or another, must still have a proper and sufficient reason for payment. This provision *204 is akin to that in the Wilson Estate case authorizing payment "for any other good reason." We hold this is not a power to alter or amend sufficient to require inclusion of the trust in the gross estate. The respondent contends, secondly, that under the provision authorizing payments of principal to Miriam with the limitation that not more than $30,000 should be paid her during the lifetime of Edith without written approval of Edith, the decedent, as substituted trustee, had the power, in conjunction with another person, Edith, to alter, amend or terminate the trust and distribute all or a part of the corpus to Miriam by obtaining the consent of his wife. In Estate of Frederick M. Kasch, 30 T.C. 102 (1958) acq. 1958-2 C.B. 6, the decedent was one of two trustees of a trust he had created for the benefit of his wife and his descendants. The trustees had power to pay to the beneficiary a portion of the principal upon written request if the income was insufficient for care, support and medical attention with the provision that during the lifetime of the donor no such principal should be distributed without his written consent. At no time was any such request *205 made and the donor never had occasion to give or withhold consent to a distribution of principal. We held that, in the absence of the occurrence of any of the conditions, the donor was without power to alter, amend or revoke the trust or to redesignate the persons to possess and enjoy the income or property. In the present case there was no request by Miriam during the lifetime of the decedent for any amount in excess of $30,000, Edith was not called upon for approval of such a payment and the decedent did not become trustee. None of the conditions occurred upon which the power depended. Under these facts this provision was not a power to alter or amend. Furthermore, if Miriam had requested a part of the principal in excess of the $30,000 provided, and Edith had given her written approval, the trustee, whether Fiduciary or the decedent or some other substituted trustee, had no authority to withhold payment. This right of the daughter did not depend upon the discretion of the trustee. The provision may not be interpreted as a power retained by the decedent. The respondent contends, thirdly, that the administrative powers retained by the decedent over the trust property were such *206 that he could shift the economic benefits of the trust. Under section 811(c)(1)(B)(ii) there is to be included in the estate the value of property transferred in trust where the transferor has retained for his life the right to designate the persons who shall enjoy the property or the income therefrom. The respondent refers to provisions of the trust indenture under which the grantor retained control of investment policy until his death, legal incompetency or voluntary relinquishment of such power, and to the provisions authorizing the trustee to borrow money from itself or any other party, to charge expenses against principal or income as it may determine, to do all acts as persons owning similar property in their own rights might lawfully do, and to determine as to certain dividends which shall constitute principal and which income, and argues that the decedent could have made himself trustee and through the exercise of these powers have substantially affected the interests of the beneficiaries. The right to invest in assets producing little income would affect the first beneficiary by limiting her income from the trust. The right to charge expenses against income or principal as *207 the trustee may determine could affect the relative interests of the first and subsequent beneficiaries. The respondent cites Commonwealth Trust Co. v. Driscoll, 50 F. Supp. 949 (1943) affd. 137 F. 2d 653 (C.A. 3, 1943) cert. den. 321 U.S. 764; and State Street Co. v. United States, (1958) 160 F. Supp. 877, affd. 263 F. 2d 635 (C.A. 1, 1959), as applicable here. In the Commonwealth Trust Co. case the settlor transferred securities to the trustee in trust and reserved the right to make any substitutions of securities he deemed advisable. The Court concluded that the retention of this right was such a reservation as to make the trust includible under section 811(c). In the State Street Trust Co. case the trustees were empowered to exchange trust property for other property and to invest in property of a kind ordinarily considered not suitable for a trust investment, being authorized to act as believed by them for the best interests of the trust fund, and to do all things in relation to the fund which the donor could do if living and if the trust had not been executed. The majority of the Court of Appeals considered *208 that under the laws of Massachusetts the trustees could administer the trusts so as to confer or withhold substantial benefits as between the life tenants and remaindermen. The settlor was one of two trustees. The Court's basis for holding the trusts includible was stated: "Literally, the trustees have power to exchange trust property for other property without reference to the value of the properties involved in the exchange. And literally, they have power to invest the trust assets in securities yielding either a high rate of income or no income at all, and even in wasting investments, and they have power to invest trust assets in these categories in whatever amounts they choose without limitation with respect to the percentage of the trust corpus invested in any one of them. Moreover, the trustees' discretionary power to allocate trust assets to corpus or income is not limited to situations where the law is unsettled and there is honest doubt whether a given accretion or receipt should be classified as capital or income. * * * Indeed the trustees' power of allocation does not seem even to be limited to accretions or receipts to any item of trust property. Furthermore, the trustees *209 may make deductions from income for depreciation, amortization or waste in whatever amounts they see fit. * * *" The powers conferred upon the trustee in the Wurts trust are not so extensive as those in the cited cases. The indenture provides that certain types of dividends shall be deemed to be principal and other types to be income, that no part of capital gains shall be counted as income and that there shall be no deductions from income on account of purchasing securities at amounts over the sale or redemption price. The trustee has no authority to make an allocation of trust property which is not an accretion or receipt. The respondent construes the indenture as authorizing the decedent, as substituted trustee, to borrow money from the trust without security. We do not so interpret the provision authorizing the trustee to borrow money from itself and to give or not to give security. The appointed trustee was in the banking business and this provision authorized it, as trustee, to borrow from itself in its capacity as a bank. Security for such a loan could be dispensed with as it would be able, in its dual capacity, to protect itself adequately. If the decedent had become substituted *210 trustee, this provision would not authorize him, individually, to borrow from the trust, but would permit him, as trustee, to borrow from himself, as an individual. The Wurts trust is to be construed under the laws of New York. In Carrier v. Carrier, 123 N.E. 135 (1919) the New York Court of Appeals held that the grantor as trustee, although having absolute and uncontrolled discretion in the investment of trust funds, is not relieved of obedience to the great principles of equity which are the life of every trust. A trustee who fails to exercise discretion properly may be compelled by the court to do what the trust requires to be done. In re Van Zandt's Will, 247 N.Y.S. 441 (1931). And it is said in Stix v. Commissioner, 152 F. 2d 562 (C.A. 2, 1945), no language, however strong, will entirely remove a power held in trust from the reach of a court of equity, and a court will intervene if a trustee has disregarded the interests of a beneficiary. The rights of the respective beneficiaries in the Wurts trust were fixed and were ascertainable. Any determinations committed to the sole discretion of the trustee were administrative in nature and *211 trivial in amount. A right of a beneficiary so qualified that it becomes a duty enforceable in a court of equity on petition by the beneficiary does not circumvent the obvious purpose of section 811(c) to prevent transfers akin to testamentary dispositions from escaping taxation. Jennings v. Smith, supra.The administrative powers in the Wurts trust were not so broad that we may conclude that the grantor, as substituted trustee, had the power materially to vary the enjoyment of the interests as between the beneficiaries. The trust agreement calls for good faith on the part of the trustee and such is also required of any trustee under the relevant principles of equity. It must be anticipated that the trustee will act in the best interests of the beneficiaries. We hold that the decedent did not retain such powers that the trust is includible in the gross estate. It is stipulated that the amount of attorneys' fees and administrative expenses allowable will be agreed upon by the parties and computed under Rule 50. Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * *
(c) Transfers in Contemplation of, or Taking Effect at, Death. - (1) General Rule. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - * * *
(B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death * * * the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; * * *
(d) Revocable Transfers. - (1) Transfers After June 22, 1936. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, * * *↩